[Civ. No. 8588. First Appellate District. Division One.—October 17, 1932.]

REBECCA SHAPIRO, Respondent, v. M. SHAPIRO, Appellant.

Wyckoff, Gardner & Parker for Appellant.

Edwin T. McMurray for Respondent.

WOODWARD, J., *pro tem.*—Plaintiff instituted an action for divorce on the ground of extreme cruelty, setting forth eleven specific acts of marital misconduct on the part of the defendant. The trial court found in favor of plaintiff and against the defendant's cross-complaint and plea of recrimination.

Appellant states in his opening brief that as to several of the accusations pleaded by plaintiff and found to be true by the court, the evidence is in "substantial conflict", but urges nevertheless that the judgment should be reversed for the reason that his own recriminatory plea was fully established. This, of course, is rather an indefinite challenge to the sufficiency of the evidence. It is not suggested, we may observe parenthetically, that the accusations of plaintiff concerning which the evidence was in conflict, were trivial in character, and for this reason it is immaterial whether

other accusations, covered by the findings, were supported by the evidence. ▉ It was not necessary that plaintiff should prove each of the allegations of cruelty set forth in her complaint. If enough material facts relied on were proved to fulfill the definition of extreme cruelty as it appears in section 94 of the Civil Code, other findings may be disregarded as surplusage. (*Avery* v. *Avery*, 148 Cal. 239, 246 [82 Pac. 967]; *Hawkins* v. *Hawkins*, 104 Cal. App. 608, 613 [286 Pac. 747].)

Before discussing appellant's point with reference to his recriminatory defense, it seems pertinent to allude briefly to the evidence adduced in support of the wife's cause of action. We do not, however, deem it necessary to set forth all of the acts of appellant pleaded by the plaintiff and found by the trial court to have been committed. A few of them will suffice.

Plaintiff testified that her husband possessed a violent temper; was in the habit of calling her vile and obscene names, and, on several occasions, slapped her face, beat and choked her. These instances of personal violence usually climaxed a quarrel between the couple concerning money matters, or the defendant's business. On March 3, 1930, according to the wife's testimony, she suggested to appellant that he pay certain notes at one of the banks in Salinas; appellant immediately resented the suggestion and during a quarrel that ensued struck plaintiff over the head with a heavy book. Sam Shapiro, elder son of the couple, testified that on one occasion (he could not fix the date) he had seen defendant throw a book at plaintiff; that it "glanced off the top of my mother's head and hit her glasses and knocked her glasses back". This witness corroborated his mother as to other instances of appellant's violence. He recalled that, on another occasion, the defendant attacked plaintiff while she was in the kitchen, knocking her down and otherwise mistreating her. The boy further testified that he had frequently heard his father call the plaintiff vile names, including "whore", and threaten to kill her. One instance of defendant's misconduct is best told in the boy's own language: "Q. How did you happen to leave military school? A. One day my father came down there and he came out with my mother and got me, and on the way my mother started to tell him how much I learned

and everything while I was there, and my father told her that he spent a lot of money on me that he would not have to if it was not for her, because he could have trained me just as well at home, and then he got mad and started to going faster and faster in his car and he told us he was going off the road and into the fence and kill us all, and I talked to him and I cried and he told us that he would run into the fence, and then he cooled off a little bit. . . . ''

Charles Nadeau, a laborer, testified that during the latter part of the year 1929 he saw the defendant strike plaintiff and knock her down. ''Q. (By the Court) You say he knocked her down? A. Yes. Q. Tell what was done then? Let's get that over with. A. Well, in the house they lived in the kitchen is a small one and the dining room is a small one and she was coming from the kitchen into this dining room and he hit her and knocks her down and shoves his fingers toward her eyes, and if I remember right he knocked her glasses off.''

Mrs. Ted Hennekin, a neighbor, testified that during the month of November, 1929, she heard a ''lot of commotion'' in the defendant's home ''like blows being struck'' and heard plaintiff say, ''Don't, please don't.'' E. J. Emerick, a former employee of the defendant, testified that in October, 1927, he saw the defendant kick plaintiff and heard him call her ''an old whore''. ''Q. When Mr. Shapiro kicked Mrs. Shapiro, what position was she in. A. She was stooping over. Q. Describe exactly how it was done. A. He come up behind her and she was stooped over and he kicked her over. . . . Q. Did you see any more conflict between them? A. Yes. Q. What was said or done? A. He said that he was going to kill her if she didn't get out, and he picked up a shovel and was going to hit her with it. . . . Q. When he had the shovel raised up, what happened? A. She ran into the house.''

Appellant now takes the position that his conduct, ''if not always justified'', in almost every instance was the result of great provocation, and that plaintiff, not having come into court with clean hands, should have been denied a divorce. ''Recrimination is a showing by the defendant of any cause of divorce against plaintiff, in bar of the plaintiff's cause of divorce.'' (Civ. Code, sec. 122.) It

has been said that while a plaintiff's conduct may fall short of the statutory definition of cruelty, yet it may be sufficiently culpable to warrant the court in denying any relief to plaintiff, especially if such conduct was of a kind calculated to cause the acts charged against the defendant. (9 Cal. Jur. 690.)

The provocative conduct, described in great detail by appellant at the trial and on which he apparently relied as an offset for his own derelictions, seems to have been a firm, and sometimes angry, insistence on the part of the wife that she be given a voice in the management of his business affairs. According to appellant's testimony, Mrs. Shapiro went to his junk-yard daily where, without his consent and over his protests, she bought and sold goods, and gave directions to employees. Frequently, he went on to testify, she disagreed with him concerning details of the business, and on such occasions called him a "lazy bum" and other uncomplimentary names. She kept a watchful eye on his bank account and on one occasion, according to appellant's version, she visited the bank where his funds were deposited and made derogatory remarks in the presence of officials concerning his credit. Appellant testified that his domestic troubles reached a climax when he undertook to improve certain real property which he owned at Salinas. The improvements consisted of a hotel and several small cottages, the property being referred to at the trial as "Bungalow de Luxe Court". During the construction of these buildings, he averred, plaintiff asserted herself in an officious and meddlesome manner; she insisted on giving orders to the contractor and workmen and, on one occasion, demanded that certain changes be made in the plans which necessitated expensive alterations in work partially completed. A number of witnesses corroborated appellant as to plaintiff's presence and activity during the building operations. Several of these witnesses insisted that plaintiff endeavored to superintend the work and while so doing often spoke harshly and contemptuously of appellant. Other witnesses, called on behalf of plaintiff, gave an entirely different version of her activities. For example, Fred Miller, one of the carpenters engaged in building bungalow court, testified in part as follows: "Q. Did Mrs. Shapiro ever interfere with you as a workman on the place? A. No,

other than to suggest things. . . . Q. Was her approach to you and her talk to you—was that in a commanding and antagonistic way or was it asking your opinion on whatever it was? A. It was just simply asking my opinion or my suggestion. Q. Did it in any way interfere or retard you as a workman in your work? A. It didn't."

Plaintiff's own explanation of her "interference" with the building operations undoubtedly satisfied the trial· court that she had been actuated solely by a desire to be helpful and not to annoy or harass the appellant. The following excerpt from her testimony is typical of plaintiff's explanations: "Q. Did you tell him (her husband) your opinion of different things? A. Yes. When we first built the garages he used to go away for a week or two weeks and at that time we had the foundation all ready and we had the apartments and I said that they shall not work on the front walls of the two houses and I thought it would take fifteen feet and then when it came I explained to him and showed him the little sketch I had made and when he went back and talked and I showed where he would have an income from these two apartments, three-room apartments— Q. Did you show him that sketch you made? A. Yes. Q. Did he use that sketch? A. Well, he didn't want to. He swore and said it was not my business but he went and built it and took my advice."

Without quoting further from the voluminous transcript in this case, it is patent from the foregoing excerpts that there was a sharp conflict in the evidence as to the conduct of plaintiff. That she possessed a sharp tongue and was sometimes contentious and vituperative in her attitude towards defendant is indicated by much of the testimony, but whether her conduct, as a whole, amounted to cruelty, or was sufficiently culpable to necessitate a denial of the relief sought by her was a question of fact addressed to the court below. The trial court doubtless concluded from all the facts and circumstances of the case that the plaintiff's linguistic excesses and other faults, if any, were negligible in comparison with the brutality and torrential obscenity of the defendant. And it scarcely seems necessary to add that where the evidence is conflicting, as in the present case, it is within the province of the trial court to pass upon its weight and sufficiency. A judgment

cannot be reversed on appeal merely because the greater weight or preponderance of the evidence is on the side of one party or the other, but only when there is a total absence of competent evidence to sustain a material finding. (*Jennings* v. *Weibel,* 204 Cal. 488 [268 Pac. 901]; *Reay* v. *Butler,* 95 Cal. 206 [30 Pac. 208]; *Hill* v. *Hill,* 106 Cal. App. 309, 313 [289 Pac. 227]; *Thoele* v. *Thoele,* 102 Cal. App. 387, 393 [282 Pac. 1001].)

Lastly, appellant urges that the trial court was harsh and unjust to him in its assignment of the community property and that the judgment should at least be revised on appeal. Plaintiff was awarded certain real property situate in the city of Salinas and referred to for convenience as "Bungalow de Luxe Court", together with all furnishings and equipment belonging thereto. In addition, the defendant was ordered to pay her $150 a month for the support of herself and two minor children until the entry of the final decree. The court found the value of the real property awarded plaintiff to be in the sum of $59,789.75 which, deducting an encumbrance of $24,100 with accumulated interest in the sum of $842,50, to be assumed by plaintiff, leaves a net value of $34,847,25. The defendant received the remainder of the community property, consisting of the "north Main Street lots", valued at $19,000, the "Harvest Street lot", valued at $1,000, and miscellaneous personal property having an aggregate value of $3,099.73. The total value of the community property thus assigned to the defendant, less certain debts in the sum of $3,631.51, which, assuming he must pay, is $19,468.22. Appellant complains that the court adopted the lowest valuation testified to with reference to the property awarded plaintiff, and the highest for the property awarded the defendant. It is contended also that the court disregarded, with resultant prejudice and injustice to appellant, the fact that the Bungalow Court property produced a net income of $9,500 for the year next preceding the trial, while the net income for the same period from the property awarded defendant was only $900. Basing his argument on testimony, which seems to have been received for an entirely different purpose, appellant contends that plaintiff was awarded property paying six per cent on $158,333. This contention possesses more plausibility than substance. The defendant himself did not claim, while

testifying, that the property in question was worth more than $65,000. Moreover, the evidence was conflicting both as to valuation and income, and in these circumstances the trial court's determination is conclusive on appeal. Nor does the fact that plaintiff was awarded a larger share of the community property than defendant necessarily indicate an abuse of discretion on the part of the court below. Section 146, paragraph two, of the Civil Code provides that when the divorce is granted on the ground of adultery, or extreme cruelty, "the community property shall be assigned to the respective parties in such proportions as the court, from all the facts of the case, and the condition of the parties, may deem just". ▮ It is true, as pointed out by appellant, that under section 148 of the same code the appellate court may modify or revise an award of community property "in all particulars, including those which are stated to be in the discretion of the court". But unless there is a clear showing of an abuse of discretion it will be presumed that the trial court acted properly, even though the decree may appear harsh. (*Rose* v. *Rose,* 112 Cal. 341 [44 Pac. 658] ; *Lynch* v. *Lynch,* 69 Cal. App. 66 [230 Pac. 462] ; *White* v. *White,* 86 Cal. 219 [24 Pac. 996].) Moreover, the plaintiff having made out her case of extreme cruelty was entitled to more than one-half of the community property. (*Brown* v. *Brown,* 60 Cal. 579, 580; *Thomsen* v. *Thomsen,* 31 Cal. App. 185, 188 [159 Pac. 1054] ; *Nave* v. *Nave,* 35 Cal. App. 27 [169 Pac. 253].) Indeed, it has been expressly held, as a uniform rule, that "when the decree is on the ground of extreme cruelty the award to the unoffending spouse must be substantially greater than that to the one who is at fault." (*Quagelli* v. *Quagelli,* 99 Cal. App. 172, 178 [277 Pac. 1089, 1091].) We cannot say there was an abuse of discretion by the court in its award of community property to plaintiff.

The judgment is affirmed.

Knight, Acting P. J., and Cashin, J., concurred.